CONTINENTAL & COMMERCIAL TRUST & SAVINGS BANK v. CHICAGO
TITLE & TRUST CO.

(Circuit Court of Appeals, Seventh Circuit. June 24, 1912.)

No. 1,894.

1. BANKRUPTCY (§ 166*)—PREFERENCES—INTENTION.
    Evidence *held* to sustain a master's finding that, by certain transactions, through which defendant bank received and applied certain assets of the bankrupt to his indebtedness, it intended to obtain a preference over other creditors, and that the bankrupt intended to give a preference, with mutual knowledge of his insolvency.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

2. BANKS AND BANKING (§ 153*)—DEPOSITS—RELATION OF PARTIES.
    While ordinarily the relation between a bank and a depositor is that of debtor and creditor, yet deposits may be made and accepted for a special purpose, and when so accepted they are not within the general rule, but the bank becomes a bailee of the depositor.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 483–501; Dec. Dig. § 153.*]

3. BANKS AND BANKING (§ 134*)—SPECIAL DEPOSITS.
    A bankrupt being indebted to his bank, in which he had a deposit account, the bank called his loans, and, after applying the deposit account to the indebtedness, agreed that, if the bankrupt would make certain deposits to cover, it would pay certain salary and pay roll checks and other checks issued to a board of trade clearing house. Deposits aggregating $3,079 were made, and after paying checks aggregating $2,506.46 there remained a balance of $575.79, which the bank also charged off as a payment on its claim. *Held*, that such balance was a balance of a special and not a general deposit, and that the bank was not entitled to apply the same to the bankrupt's pre-existing indebtedness, or to an allowance thereof against the trustee by way of set-off.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 353–374; Dec. Dig. § 134.*]

4. BANKRUPTCY (§ 326*)—PREFERENCES—MARGIN CERTIFICATES.
    Defendant bank, a board of trade depository, issued margin certificates to customers to be used as margins in board of trade transactions,

and. having certificates aggregating $4,250, issued to a bankrupt at the time of his failure, arranged with the A. Company to take over the bankrupt's outstanding trades, which resulted in the return to defendant of the certificates, the value of which it applied to the bankrupt's pre-existing indebtedness, with knowledge of his insolvency. *Held*, that the delivery of the certificates to the bank constituted a transfer, in violation of the Bankruptcy Act, for which the bankrupt's trustee was entitled to recover, and that the bank was not entitled to credit the value of the certificates against the bankrupt's indebtedness, nor to a set-off under Bankr. Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp. St. 1901. p. 3450), providing for a set-off of mutual debts or mutual credits; the transaction being within clause "b," subd. 2, providing that a set-off shall not be allowed, where it was purchased by or transferred to the creditor after the filing of the petition, or within four months before such filing, with the view to such use, or with the knowledge that the debtor was insolvent or had committed an act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 514; Dec. Dig. § 326.*]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by the Chicago Title & Trust Company, as trustee in bankruptcy of Earl H. Prince, against the Continental & Commercial Trust & Savings Bank, as successor, substituted for the Federal Trust & Savings Bank, to recover certain alleged preferences. From a decree confirming a master's report in favor of complainant, defendant appeals. Affirmed.

This appeal is from a decree of the District Court, confirming the master's report and awarding recovery against the appellant bank, as successor substituted for the Federal Trust & Savings Bank, defendant, under a bill filed by the appellee, as trustee in bankruptcy, charging that the defendant received unlawful preferences from the bankrupt. W. P. Anderson & Co. were joined as defendants in the bill; but the District Court entered a dismissal as to them, and no question is raised in respect thereof. The material facts constituting the alleged preference are undisputed, largely embraced in stipulations, and appear as findings of fact in the master's report, from which the following summary is extracted:

(1) The proceedings in bankruptcy against the bankrupt, Earl H. Prince, were instituted February 15, 1905. For several years theretofore he was a member of the Board of Trade of Chicago, engaged in the buying and selling of commodities subject to the rules of the Board of Trade. During the same period the defendant Federal Trust & Savings Bank was engaged in general banking business in Chicago, and Prince was transacting his banking business with such bank, and had a general deposit and checking account therein up to February 10, 1905.

(2) The rules of the Board of Trade provided for a method of trading between its members in a so-called "ringing up of trades," whereby settlements were made through the Board for such transactions. On time contracts it was provided that purchasers shall have the right to require of sellers as security a deposit of 10 per cent. based upon the contract price of the property bought, and further security from time to time as the market advances, and that sellers shall also have the right to require as security from buyers a deposit of 10 per cent. of the contract price of the property sold and in addition any differences that may occur between the estimated value of the property and the price of sale. For these purposes the rules further provided that banks may be authorized to issue margin certificates to be used in such cases and become authorized depositories for securities on giving bonds for the proper disposal of deposits by them, and that banks so authorized be designated as "Board of Trade Depositories."

The certificates to be issued by the depository in such case were to be made in duplicate and nontransferable for all deposits made with them, were to state by whom the deposits are made and for whose account they are held, and that the same are payable upon the return of the certificate or the duplicate thereof duly indorsed by the parties to the contract, or on the order of the president of the Board of Trade. The form of the certificate is prescribed by the rules and the memorandum thereof which shall be kept, and all certificates when issued are required to be placed in the office of the Clearing House of the Board, and all business pertaining to the issuance and use of the said certificates is required to be carried on in accordance with the rules of the Board.

(3) From and after August 20, 1902, the Federal Trust & Savings Bank was a Board of Trade depository. On and prior to February 10, 1905, the bankrupt had a deposit and checking account with the bank, and at the date named was largely indebted to the bank on demand notes and otherwise. On February 10, 1905, the bank "called the said loans and they were not paid, and thereupon the bank applied as a payment upon the same $3,095 then on deposit in the bankrupt's checking and deposit account in the bank," thus leaving to the credit of the bankrupt in that account only the sum of $3.25. On the same day the bank agreed with the bankrupt "that, if he would thereafter make deposits to cover the same, it would pay certain salary and pay roll checks of employés of Prince and checks issued to the Board of Trade Clearing House." Pursuant to such agreement the bank did pay such checks issued on several days up to February 14th, amounting to $2,506.46; and Prince deposited with the bank on February 10th, $1,450, on February 11th, $310, and on February 14th two deposits, one for $820 and the other for $499, making a total of his deposits of $3,079; all of these items being entered on the books of the bank under date of February 14, 1905. The amounts thus deposited exceeded the amount of checks paid under the arrangement in the sum of $572.54. This balance, together with the $3.25 remaining to the credit of Prince on February 10th, making the sum of $575.79, was applied by the bank on February 14th as a credit upon the general indebtedness of Prince to the bank. Other checks drawn by Prince on and prior to February 10th, which were not included in the above-mentioned arrangement then made, were subsequently presented to the bank, but payment refused.

(4) At various dates between September 15, 1904, and February 9, 1905, the bank had issued to Prince margin certificates to be used by him in his Board of Trade transactions, which were placed by him in the office of the Clearing House of the Board for various sums, ranging from $250 to $500 in amount, aggregating $4,250. To procure such certificates Prince either gave checks against his checking account or deposited with the bank the requisite sum of money. A record of these margin certificates was kept in the bank in a "Margin Register," and the total of each day's margin certificates issued was entered in the ledger of the bank in an account called the "Margin Account," and the total of all unpaid margins appeared on the bank's ledger as one of the items constituting its total liabilities.

(5) On February 14, 1905, Mr. Castle, the vice president of the bank, and Mr. Prince, had a conference at the bank in reference to the financial affairs of Prince, and, while together, Mr. Castle telephoned to W. P. Anderson, president and treasurer of W. P. Anderson & Co., to join the conference. On the arrival of Mr. Anderson Mr. Castle informed him that Prince was in financial troubles in quite a number of open trades, and asked Mr. Anderson's advice as to the best way to close them. "Mr. Anderson suggested that Prince transfer them to some other dealer and close them up in that way. Prince asked Mr. Anderson if his company would take them and he agreed that it would if, after examination, the trades showed a profit. Investigation was made by Mr. Anderson, and he was satisfied with the conditions, and on the same day, February 14th, or the day following, Prince transferred all of his open trades in accordance with the rules of the Board, and Anderson & Co. assumed and agreed to carry out the contracts with the various parties with whom they were made." On February 15th the secretary of

the Board of Trade, on request of Anderson & Co., notified members having trades with Prince to transfer them to Anderson & Co., and "that Prince's sheet would clear on that day. as usual, but that rings made for the following day would be closed by Anderson & Co." Anderson & Co. thereafter settled the transactions, putting up its own securities in the place of the certificates deposited by Prince, to secure the same, and the Prince certificates were taken up by Anderson & Co. and turned over to the bank on that day. When these certificates were turned over to the bank, Prince was indebted to it in a sum greatly exceeding the amount of the certificates, and the bank thereupon credited the amount thereof, $4,250, on account of such indebtedness.

The finding further states: At the date of these transfers of the open trades of Prince, the condition of the market was such "that the aggregate sum of the amounts due thereon to Prince from the members of the Board of Trade, if he had then settled the trades, would have been greater than the aggregate sums of the amount then due thereon from Prince to others of said members of the Board. Among the open trades so transferred and settled were trades with members of the Board who held securities on margin certificates furnished by Prince." The market was constantly changing, and "if the trades with the members holding Prince margin certificates had been closed at the opening of the Board of Trade on that day by the members holding them, there would have been due from them to Prince in the aggregate a balance of approximately one-third of the amount of the certificates after deducting therefrom the amount that would have been due to them from Prince. If the trades had been closed later in the day, the balance coming to Prince would have been considerably less. However, if Prince had carried out all of these contracts, the profits which would have been made upon some of them would have been about balanced by the losses which he would have sustained on others."

(6) On February 15, 1905, the proceedings in bankruptcy were instituted, and the appellee was eventually appointed trustee in bankruptcy. The indebtedness of the bankrupt at the date of the above-mentioned transfer of his trades exceeded the sum of $100,000 to numerous creditors, aside from the bank, and his assets were less than $50,000 in value.

(7) Circumstances appear in the relations between the bank and Prince which leave no room for doubt that the bank had, on and after February 10th, reasonable cause to believe that Prince was insolvent; that the transactions between February 10th and February 14th were "calculated to keep Prince going and to protect the Clearing House, as well as the bank," without protection for general creditors; that the transactions of February 14th and 15th were "primarily in the interest of the bank" and were intended for its benefit.

The master thus states his ultimate finding of ,fact thereupon: "The conduct of Prince's affairs for the five days preceding the filing of the petition against him is of such a character as to exclude every other conclusion, except that it was the intention of both Prince and Castle to reduce Prince's indebtedness to the bank as much as possible, by applying thereon all of his available assets and by so disposing of his business and open trades on the Board as to realize the greatest possible amount for the bank to the exclusion of his other creditors."

The master reported his conclusions of law, which were adopted by the District Court, in substance, as follows: (1) That the transaction of February 10th, whereby the bank applied the sum of $3,095 out of the balance of Prince's credit then appearing in his banking account upon his indebtedness to the bank on promissory notes, was not an unlawful preference; (2) that the application made February 14th on such prior indebtedness of $575.79 then remaining as a credit to Prince under the special deposit arrangement entered into February 10th constituted an unlawful preference; (3) that like application of $4,250 on February 15th as the amount of "margin certificates" delivered to the bank under the arrangement with W. P. Anderson & Co., constituted an unlawful preference; (4) that the complainant, trustee in bankruptcy, is entitled to recover, accordingly, $4,825.79, together with interest from November 25, 1905, when payment was demanded and refused.

Horace Kent Tenney, for appellant.
Edwin Terwilliger, Jr., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The appellant bank is successor in interest and liability to the Federal Trust & Savings Bank, original defendant named in the bill filed by appellee, as trustee in bankruptcy, to recover the amount of alleged unlawful preferences obtained from the bankrupt, Earl H. Prince; and this appeal is from a decree which approves the master's report therein and awards such recovery upon two transactions, namely: One of $575.79, as a balance of certain deposits made by the bankrupt under special arrangement with the bank, between February 10th and 14th, appropriated by the bank immediately prior to the bankruptcy proceedings, and the other amounting to $4,250 for so-called "margin certificates" theretofore issued by the bank for special deposits made by the bankrupt, which were obtained and appropriated by the bank on February 15th, the day on which the proceedings in bankruptcy were instituted. Both amounts were applied by the bank as credits upon pre-existing indebtedness of the bankrupt under promissory notes. The circumstances attending these transactions, together with the facts from which the nature of each must be ascertained, are not only settled by the master's findings of fact, but are undisputed.

[1] While objection is urged to inferences of fact found by the master as to the mutual intention of the parties in the outcome—in substance to benefit the bank out of such assets to the exclusion of other creditors—as unwarranted by evidence, we believe no doubt is entertainable of the intention to give and obtain a preference over other creditors, with mutual knowledge of the bankrupt's insolvency, if, in other respects, the transactions (one or both) were violations of the Bankruptcy Act. The issue in each instance, therefore, is one of law, whether the amounts thus obtained and applied constituted unlawful preferences, with the solution of each resting on established facts as to the relation existing between the bankrupt and the bank in the matters so applied.

Counsel for the appellant contends for reversal mainly, if not entirely, on this proposition in substance: That the various deposits by the bankrupt, out of which these appropriations arose, were made and carried in the common relation of debtor and creditor, and were thus subject to the right of set-off provided by section 68 of the Bankruptcy Act—as upheld and defined by the Supreme Court in N. Y. County Bank v. Massey, 192 U. S. 138, 141, 24 Sup. Ct. 199, 48 L. Ed. 380, and by this court in Re George M. Hill Co., 130 Fed. 315, 64 C. C. A. 561, 66 L. R. A. 68, so that both method and fact of appropriation by the bank become immaterial, either amount being enforceable in such relation, as against the trustee in bankruptcy.

[2] The citations referred to rest on the general and well-settled doctrine of the relation created between banker and depositor, when

deposits are made upon general account in the ordinary course peculiar to banking business; and in the absence of proof that the deposit was otherwise intended and received, it may rightly be presumed that such was the nature of the transaction. On the other hand, it is equally well settled that deposits may be made and accepted for specified purposes, not within the general rule, whereby "the bank becomes bailee of the depositor" (Marine Bank v. Fulton Bank, 2 Wall. 252, 256, 17 L. Ed. 785; Scammon v. Kimball, Assignee, 92 U. S. 362, 370, 23 L. Ed. 483), or trustee of the fund, with title thereto remaining in the depositor until the purpose of deposit is discharged; and the relation thereby established is not that of debtor and creditor, although it was not intended that the identical money so deposited was to be held for the payment. It is the fund, not the particular money deposited, which becomes the subject-matter of the bailment or trust (Woodhouse v. Crandall, 197 Ill. 104, 64 N. E. 292, 5 L. R. A. 385, and notes; Shopert v. Indiana Nat. Bank, 41 Ind. App. 515, 83 N. E. 515), as illustrated in Bank of Brodhead v. Smith, Trustee, 199 Fed. 704, decided by this court in an opinion filed April 23, 1912. The tenability, therefore, of the foregoing contention, hinges upon the inquiry whether the transactions in controversy arose out of general or special deposits under one or the other above-mentioned rules.

[3] 1. The first item of $575.79, charged as an unlawful preference, was a balance of deposit account standing in favor of the bankrupt and appropriated by the bank, February 14th, one day prior to the bankruptcy proceedings. Prince, the bankrupt, had long been engaged in business as dealer on the Chicago Board of Trade, and up to February 10th had an active general banking account with the Federal Trust & Savings Bank; also was indebted to the bank upon promissory notes in excess of $30,000. On February 10th, the bank "called" these loans and applied thereon $3,095 of the balance in favor of Prince in his bank account, leaving $3.25 as a balance of deposit account. Thereupon it was proposed and agreed on the part of the bank, if Prince "would thereafter make deposits to cover the same, it would pay certain salary and pay roll checks of employés of Prince and checks issued to the Board of Trade Clearing House." Pursuant to this agreement deposits were made by Prince, February 10th, 11th, and 14th, aggregating $3,079, but entered on the books of the bank February 14th. Checks made by Prince for the stipulated purposes were paid by the bank aggregating $2,506.46. On February 14th—at a conference and arrangement for closing out the entire business of the bankrupt, as hereinafter mentioned—the balance of the deposit account then standing in his favor, $575.79, was charged off by the bank and applied upon his indebtedness to the bank. Irrespective of the master's findings, that the arrangement of February 10th was "calculated to keep Prince going," was "primarily in the interest of the bank," and intended for its benefit to the exclusion of other creditors, we are of opinion that the deposits left and made thereunder constituted special deposits, well within the above-mentioned rule, whereby title to the un-

expended fund remained in the bankrupt, so that the bank was without right, either to apply the residue upon his pre-existing indebtedness, or for allowance thereof against the trustee by way of set-off. Libby v. Hopkins, 104 U. S. 303, 306, 26 L. Ed. 769; Western Tie Co. v. Brown, 196 U. S. 502, 507, 25 Sup. Ct. 339, 49 L. Ed. 571; Bank of Brodhead v. Smith, Trustee, supra.

[4] 2. The other charge of preference—in obtaining "margin certificates" for the aggregate sum of $4,250, on the day the petition in bankruptcy was filed, which were then credited upon the pre-existing indebtedness of the bankrupt to the bank—involves like inquiry as to the nature of the certificate and deposit thereby certified, and consideration as well of the circumstances under which they were acquired by the bank. For both phases of the inquiry the facts in evidence are recited in the preceding statement for the purposes of this opinion, and the details do not require repetition, but the crucial facts may be briefly stated.

These certificates were issued by the bank, in its representative capacity as a "Board of Trade Depositary," under the rules of the Board of Trade and its undertakings as such depository. Each certificate in controversy was issued to Prince, the bankrupt, upon his deposit of the amount thereof (either in money or by his check accepted as cash), for the purpose specified in the certificate, namely, as pledge or security on his Board of Trade contract with a second party named therein. Each certifies the amount deposited to be payable on its return indorsed by both parties named therein, or "on the order of the president of the Board of Trade," as provided by the Board rules "under which the above-named deposit has been made," and each bears designation as "not negotiable or transferable," and is signed by the cashier of the bank. The purpose of each further appears in evidence, in accord with the recitals and plainly within the understanding of all the parties. Each of the outstanding certificates so issued to the bankrupt was on deposit with the "Clearing House of the Board," as required by the rules, evidencing the amount thus pledged with the bank as security for the trade therein mentioned, which had not been closed. Under this state of facts, we believe the deposits thus made and accepted at the bank were plainly so limited in their purpose, that the rule in reference to general deposits by a customer of the bank is without force therein; that each was received and certified by the bank, as depository of the fund thus pledged by the bankrupt for performance of his trade, creating no title thereto in the bank, nor other right than that of bailee or stakeholder, to hold for payment in conformity with the stated purpose. So the fact of deposit and holding thereunder vested no right in the bank to divert the fund from such purpose and apply it upon the bankrupt's indebtedness.

The bank, however, secured possession of these certificates before making such application and the further contention is thereupon pressed that it is entitled to an allowance for their amount, either in that form or by way of set-off against the trustee, notwithstanding the circumstances under which they were acquired. Arrange-

ment to that end was made on February 14th, with the bank as the moving party, after its closure of the bankrupt's credit account as above mentioned. Mr. Anderson, another operator on the Board of Trade, was called in by the bank for conference in respect of the bankrupt's open trades, of which "quite a number" were then outstanding, inclusive of trades secured by the "margin certificates." On examination thereof Anderson was satisfied that they "showed a profit," taken as an entirety, and agreed to their assumption by his corporation. All the open trades were then transferred by the bankrupt to such corporation, and its substitution was carried out in the Board of Trade on the following day, resulting in release of the certificates issued to the bankrupt and on deposit for a portion of the trades thus taken over; and these certificates were received by the Anderson Company, pursuant to the Board rules on substitution of their own securities, and were thereupon delivered by them to the bank, without intervention of the bankrupt. On the same day the bankruptcy proceedings were instituted, doubtless precipitated by the substitution.

These transactions establish, as we believe, an unlawful preference in favor of the bank, with Anderson & Co. serving as intermediary to that end. The various propositions advanced as to results which may have arisen through default in the bankrupt's trades, in whole or in part, in the absence of such substitution, are beside the inquiry; nor is it material what may have been the estimate of net profit in the trades, nor what portions were profitable respectively. As the transfer was made and performance of the several trades assumed by the purchaser, release of the certificates to secure performance on the part of the bankrupt was plainly intended. Thereupon the bankrupt became entitled to them. Delivery of the certificates to the bank, therefore, consummated a transfer in violation of the Bankruptcy Act, for which recovery by the trustee is expressly provided. Thus their appropriation by the bank for credit upon the indebtedness of the bankrupt was unauthorized.

Is the bank, however, entitled to like benefit out of the transactions through set-off in its favor, as contended? We are of opinion that no such right exists under the terms and obvious purpose of section 68 of the act. The first clause (68a) cited in support thereof, provides only "for cases of mutual debts or mutual credits" between the estate and a creditor, wherein "the account shall be stated and one debt shall be set off against the other." In our understanding of the authorities (as above stated), these special deposits and liabilities are not embraced in such provision for set-off. But, if it be assumed that the relation of debtor and creditor was created between the bank and the bankrupt at any stage, such relation must arise through the transaction which released the pledge, making the amount deposited payable to the bankrupt, whereby the bank (under the assumption) becomes his debtor. Thus viewed, the claim of set-off must be rejected under the express limitations prescribed in clause "b" (2) of the section. Moreover, in Western Tie & Timber Co. v. Brown, 196 U. S. 502, 510, 25 Sup. Ct. 339, 49 L. Ed. 571,

the last-mentioned clause is construed to be applicable as well to a case of trust relation, and the opinion states that allowance of the claim of set-off "under the circumstances disclosed would violate the plain intendment of the inhibition" of that clause.

The transcript of testimony on the part of a witness (Wolf), received in evidence under objection, upon which error is assigned, does not enter into consideration for the purposes of the appeal, and the question raised as to its admissibility becomes immaterial.

The decree of the District Court, therefore, is affirmed.